Page 3130 Ross R. Pina v. MSPB Mr. Tijerina Thank you, Your Honor. May it please the Court? I'm Lorenzo Tijerina. I'm the attorney for Mr. Pina. May I commence? Yes, please proceed. Your Honor, the question before the Court is the one of jurisdiction. Whether or not the board, the Merit System Protection Board, should have taken jurisdiction or exercised jurisdiction over Mr. Pina's case. The facts indicate that Mr. Pina did, in fact, retire. And traditionally, this Court, as well as the board, wherever we had a retirement where an individual voluntarily retires or resigns, the board lacks jurisdiction. There's no argument there. What we've asked the Court to do is to examine the record itself, to show that Mr. Pina fell under the exceptions that this Court has often and traditionally granted. By that, I mean where the agency had proposed or threatened an adverse action. That's under the crews v. Department of the Navy, where the employee was misinformed or deceived. And that's under Covington v. Department of Health and Human Services. And the agency coerced in some way the employee, and that falls under Brown v. Department of Veterans Affairs. I think you've correctly outlined the three general ways in which a litigant can attempt to show that a resignation or retirement was involuntary. Misinformation, improper removal or intolerable working conditions. You've basically gone through that. But which one do you really focus on in this case? Are you saying that all three of those were present here? Because I didn't really see what would be the basis for a claim of misinformation, and I didn't really see much here on intolerable working conditions, unless you're referring to the situation in the rows when Mr. Pina had his seizure attack. But which of those three avenues of approach are you really taking? Are you really taking all three? Yes, sir. I believe that the facts do in some way support all three. For example, let's take the intolerable working conditions at that time. For the sake of argument, let's say that somebody within this room were to have the same thing that Mr. Pina had, a seizure, an anxiety attack, an angina attack. And instead of, for whatever reason, we say, well, let's call 9-1-1, I mean, I'm sorry, let's call Crime Stoppers, because that's what happened. The supervisor called Crime Stoppers. There's nobody arguing, I think, with the fact that that was badly handled by his supervisor at that time. But the intolerable working conditions doesn't typically look to whether there was a particular incident that was the cause of the whole event. It usually looks to the question of whether, over a course of time, he had been singled out in some way for mistreatment by the agency over a period of time that eventually forced him to say, I just can't take it anymore. That wasn't the kind of case that this presents, is it? Putting aside just that one day, take that one day out of the case. What are the intolerable working conditions? In our brief, Your Honor, I think we went back and showed some history where this so-called AWOL incidents keep occurring. In our fact pattern, we brought out the incident in 2004. We brought out the incidents that, with this particular supervisor, Mr. Pena has had this difficulty that he can't seem to, there's an idea there that if Mr. Pena goes to run an errand, he's AWOL. If the supervisor doesn't see him, he's AWOL. That can get old. And I mean, that's singling you out, no matter how you look at it. And just taking that one incident, that one day, what happened with Mr. Pena, that one day he was charged with AWOL. I know that the government has argued, the agency has argued, that no, he wasn't charged with AWOL. He was going to be charged. But that's not what the facts brought out. He was charged with that one day without any notice whatsoever. And I'm sorry. The government also argues that on the occasions when he was charged with being AWOL, in fact, he was. No, Your Honor, I think the record goes back and it says that he went in and he fought it. Now, what happens with Mr. Pena, he fought it and instead of taking the whole, asking for an EEO hearing, he took the agency's final decision. The agency's final decision indicated that he did have, did make a primal facial case for discrimination. However, it found that he did not articulate any defense for the so-called legitimate reason that the agency provided. And he didn't appeal. Mr. Pena may not be a sophisticated man as far as what we consider to be able to exercise his rights, but he is a good mechanic. He does work on the agents. He has his talents. And Mr. Pena has a history of having a problem that goes back to his time in Vietnam. So he does get excited, he does get adamant, but those have been situations where he has never hurt anybody. There's no history of him hurting anybody. There's no history of him being a clear present danger to any other individual. How does that relate to the question of whether he voluntarily retired? On the same day that he came back from the hospital, after the suffering and anxiety attack, after going through his angina attack, he was presented with a phone call that said, oh, by the way, you can't come back for at least 30 days. We're going to suspend you with pay for at least 30 days. And that was on the 22nd of January 2007. On the same day. It wasn't how are you feeling, what happened, can you come in? The same supervisor writes him that letter and says, oh, by the way, I'm going to investigate this. Well, he had threatened bodily harm. Sir? He had threatened bodily harm under the stresses that he was under. One can argue about the stresses he was under, but according to the testimony, he had threatened to do bodily harm. Those particular affidavits, they're not really affidavits, and they're not really memo of records, what they are is e-mails saying, well, we heard him say this, and they were written like almost 90 days after the incident. All the e-mails were written about 90 days after the incident, where the so-called supervisor and the employee relations specialist wrote back to these individuals who were supposed to be witnesses, and they said, oh, yeah, we heard him say this. Well, yeah, I think I heard him say this. I'm sorry, will you finish your question? Mr. Pena, the other one is P-E-N-A, he says in his e-mail, he doesn't recall anything else. He doesn't cite any curse words. He doesn't cite any threats until he is asked later on. No, I wanted to give a chance to finish your answer to Judge Plager's question. The joint appendix, RA 41, the last paragraph, and this is Mr. Pena's submission on the jurisdictional issue, he says, there is no doubt that the agency threatened the appellant with removal. True. And the appellant was faced with intolerable working conditions when the supervisor failed to immediately summon EMS. And that's the basis for the case. Typically, our cases, you know, intolerable working condition cases show a pattern of improper conduct by the agency over a period of time. So then you're left with, so if you knock that out, and I do think, I don't think you have much of a case on that. So that leaves you with the argument that there was misconduct on the part of the agency in the removal action. And what we said there is, is the removal action without any basis, so that it was a fraud, really, or something like that. And here, while, you know, there are two different versions of what happened that day, both in front of the supervisor and then in the restroom, there hasn't really been a case made out that there wasn't a basis for the removal action, sufficient to put the employee in a position where it was a sham action. Your Honor, I think that January 21st was the tip of the iceberg. And I think that the documents that the agency has presented to support its case show that it's the tip of the iceberg. And that's what we focused on. I'm sorry. No, no, no, that's no problem. I mean, the agency, though, gives two different, the agency gives a different version than yours. And the point is, you, Mr. Pena has a version of what happened on that day, and the agency has a version of what happened on that day. And Mr. Pena, by retiring, chose not to challenge that. But there doesn't appear to be any evidence to support the proposition that the agency charges were totally without merit. There's statements, declaration, so forth. Maybe if you'd gone to a hearing before the Board, Mr. Pena might have prevailed. But there's certainly nothing on the face of it that suggests the charges were unwarranted on their face. Okay. Basically, technically, the only charge, the proposed notice of removal, that would have been the only charge. Am I correct? Yeah, there's a threat, that Mr. Pena made a threat when he was in the restroom. Right. And the record shows that Mr. Pena was not himself, that Mr. Pena had, and there's testimony that he fainted, that he wasn't coherent, that he was fighting everything. Well, no, I understand all that, but you see, you're basically, and all of the points you're making are correct in terms of what Mr. Pena's arguing is if we were up here on an appeal from the Board sustaining the removal, and you're saying, it sounds like you're saying there's not substantial evidence in the Board decision sustaining the removal, but Mr. Pena never, he had the chance to advance his position, he chose not to do so. On its face, the agency presented evidence of a threat. They presented evidence of a threat to a man who was undergoing a medical problem. It's like a drowning man bringing down the person who's trying to rescue him. Isn't it? A drowning man will grab anything. No, I understand. That might be a reason, though, why if Mr. Pena had chosen to appeal to the But there's nothing to suggest that on their face the charges were totally unwarranted. Maybe he would have won if he'd gone before the Board, but whether they're unwarranted is a different question. That's what you seem to have to show to prevail on a charge, on a claim that your retirement was involuntary. In this particular case, Your Honor, I think that the medical condition of Mr. Pena needs to be given some weight. You're saying his medical condition weighs into the voluntariness issue? Right. On March 22nd, I think, Dr. D. Derber, the psychiatrist, indicated that Mr. Pena is a depressed person. Mr. Pena is on medication. Now, if I'm depressed and then all of a sudden I get these additional documents, his knee-jerk reaction was to just get away from the situation, and I don't think he understood the consequences of him going and resigning. Are you raising the question of whether when he filed his retirement on March 31st he was incompetent or unable to make that decision? Sir, I think that particular decision was based on his depression. Like I said, on March 22nd or 18th, Dr. Derber, the psychiatrist, gives his analysis that Mr. Pena is in fact depressed, and I think that's part of the record, Your Honor. I think it's our Exhibit E. There was an 11-day gap between the time they served this notice of proposed removal on him, which as I read the record, was on March 20th, and he met with Ms. Mercer on March 29th, and it was on March 31st, 11 days later, that he executed his retirement, took retirement. Yes, Your Honor. I guess what's troubling me is what's troubling Judge Schall also, and that is, what can we say was the I think the motivating factor was that he was ready to lose everything. He was losing everything. And then all of a sudden to lose his retirement also? I mean, that's what we had… So you think the motivating factor was he was confronting a proposed removal and thought he could protect himself by taking retirement instead? Yes, Your Honor. But isn't it the case that our law says when faced with two unhappy alternatives, and you pick one, which happens to be retirement, that that doesn't make the retirement involuntary? Yes, Your Honor. Don't we have cases that say that? Yes, Your Honor, but I don't think the cases address the medical condition of the employee. I think you do have in the Turan case where it tries to say, where this court has said take all the elements into consideration. Look at the total circumstances surrounding the so-called action, the resignation of the retirement. And in this particular case, if you look at Mr. Pena, and you take the medical, because the medical evidence has been made part of the record. You do have the psychiatrist who says that Mr. Pena, even though on the 19th of January presented a very hostile and belligerent individual, all of a sudden you find out that he is suffering from depression. And he was instructed by the agency, go and get us some medical evidence which indicates from a licensed psychiatrist that you are not a clear and present danger, which he did, and he brought it back in March, March 20th, I think, if I'm not mistaken. After that, shortly there, either the day before or the day after, I think it's the day after, he gets his proposal letter of removal after complying with exactly what the agency had told him. It says show us that you are not a clear and present danger to yourself or to others, and we'll consider you. He goes and he does that, and the record shows that he is suffering from depression. He goes and he does it, and they turn right around and say, oh, by the way, we're terminating you. I think after you get a clean bill of health from your physician, then all of a sudden you're told, no, even though you complied with what we told you, we're still not going to hire you. That would put me back in depression. I think it would to any individual. Now that's an important point. Let's hear from the government. Thank you, Your Honor. Good morning. May it please the Court. The Board lacks jurisdiction over the voluntary actions of federal employees. Mr. Pina's retirement that he initiated himself is presumed- Ms. Friedman, would you discuss the last point that counsel made, that when he did get the physician's letter complying with what he had been asked to do, that is a psychiatric examination and statement as to whether he could work at this job, the next day he was nonetheless terminated. Well, he was never terminated. Or given a notice of proposed removal. The notice of proposed removal was given to him on March 22nd. I have March 20th, but I don't think it matters. We have March 22nd. No, that was after he was provided- And the March 7th and 15th psychiatrist and psychologist reports were given into the agency before the notice of proposed removal. That's true. But the charges were inappropriate conduct in how he acted on March 22nd, and the charge was threatening- That wasn't my question. My question is how you account for after these events occurred, and he was told that he should see a psychiatrist and get some sort of statement as to whether he was or wasn't able to come to work and fulfill the requirements of the physician, and he did that. And thereafter, he was given the notice of proposed removal anyway. Right, and the proposed removal was because of the incident, and the agency just wanted to make sure- That wasn't my question. He responded to what he was asked to do after the incident occurred. You're saying that that was just a sham? No. Never mind, we'll require you to get all of this medical evidence, but we're not going to pay any attention to it? No, I think they did pay attention to it, but during the time- How did they pay attention to it? Well, I think that they did by giving him the notice and giving him an opportunity to come in and showing the evidence and saying, listen, there were reasons why all this happened, and perhaps it wasn't really a threat, maybe. He never went to the agency to dispute the charges. Did the notice refer to the psychiatrist's letter? The notice just referred to the fact that he was asked to get a psychiatrist's letter to make sure that he wasn't a danger to himself or to others. But he did get such a letter. Yes, he did. And the agency was still entitled, because of the incident of January 22nd, to set forth charges on what happened that day. Well, if they were going to ignore the letter, why did they require him or instruct him or suggest that he obtain it? Because in the meanwhile, they were going through an investigation on whether he would have the confidence, whether the agency would have the confidence and the trust to have him come up on the job. That's just one of the factors that you look at. The biggest factor that they looked at was that the incident that occurred on January 22nd was very serious, that Mr. Pina obviously lost it, and it was over a dispute over a 15-minute notation on his time card of an AWOL. And the incident, as alleged by the agency, was that he started talking loudly to his supervisor, he punched the tool cabinet, made his hand into a fist, raised his hand as if it was a gun, went to shoot him, pantomime shooting his supervisor, and at that point said that he was agitated and needed a pass to go to the clinic. The supervisor admittedly may not have handled the situation very well, but the point is he never barred his way from going to the clinic, and when it was obvious that he was in medical distress, the supervisor himself called paramedics to come and get him. But the point of the whole issue of this case is whether his retirement was involuntary. And you look at a three-pronged test starting from Fruhauf, and that is did the agency impose the terms of his retirement on him? Was there no realistic alternative but to have him retire? And did the agency do anything incorrectly that precipitated his retirement? And I think that Mr. Pina did not meet any of the elements of the Fruhauf test. First, the agency did not impose the terms of his retirement. I still don't understand. The agency said that if you want to come back to work, see a psychiatrist and see if the psychiatrist will authorize that you are competent to come back to work. So he did that. Then after he does that, they give him a notice of proposed removal, even though he does what they asked him to do. And you're saying, I don't know what you're saying, as to how this fits in with the grounds that you tell us, which would justify the alternatives, obviously very difficult alternatives, offered to someone who can stand and fight it and risk losing everything, apparently, including losing the pension. No, that's not correct, Your Honor. He was a first employee, that is, he was an employee that was covered under the Federal Employment Retirement System. And as long as he had the minimum retirement age in service, he was vested with his retirement, and it was just a misapprehension on his part that he would lose his retirement. He would get the same retirement whether he retired voluntarily or whether he was removed? That's correct. Apparently this wasn't explained to him? Well, there's nothing in the record that he ever asked anybody to explain anything to him. He had the possibility of union representation, and he never went to a union representative to see what his options were at that time. And in answer to your question of, you know, shouldn't the agency have looked at this medical evidence, the agency had people in his unit that was in fear of this employee because he had done this threat. And that piece of evidence was just one piece of evidence in an investigation that the agency is entitled to look at. When they affected his termination letter, his proposed termination letter, they gave him ample opportunity to come in and, in fact, wrote in the proposed termination letter that it's very important to answer the charges if you disagree with anything that's on here. He did not do that. Instead, he retired well before he could have answered the charges just to the agency. They didn't have to affect the removal if he had good reasons, if he could have argued, he could have... No, but you're presupposing rational behavior, and here we have someone who's already been diagnosed as subject to depression, and his response, his reaction were extreme, which fits in with the diagnosis that we've heard. Well, before the board, he never said that, Oh, my retirement was involuntary because my mental state stopped me from making a valid, voluntary decision. Well, that's what counsel tells us. But he tells this to the court. He did not tell this to the board. Is that fatal? Yes. To say that he can't, on appeal, say everything went wrong at the time? This is a new argument, and under cases like Sinan and Meglio, the court cannot rule on an issue that wasn't brought up first before the board. But he wouldn't have a hearing. I'm sorry. I'm sorry. Go ahead. I was just going to ask if he was represented by counsel before the board. Yes, he was. Same counsel? Yes. Okay. We'll talk about it. You're saying that no one told the board that he was depressed, suffering from depression, and had this psychiatric review? Well, the administrative judge, in her initial acknowledgment order, recognized that this was the incident that precipitated the proposed notice of termination. It might have indicated a mental condition. So she actually stated what was required to show involuntariness, if he was showing that it was based on a mental or physical handicapping condition. He did not come to the board with these types of arguments. The administrative judge made it up, or what? I don't understand. You're saying the administrative judge observed that he had these various problems, but you said he didn't tell the administrative judge about it? No. Where did the A.J. get this information? The A.J. looked at the incident itself and how Mr. Pina fell to the floor and was taken to the hospital and decided that there may have been a medical problem. So, yes, she did take it on herself at that point to do a medical diagnosis. Based on some written record? No, not a medical diagnosis, but just to advise just in case there's a medical condition to come out with an argument that would indicate some kind of involuntariness in him submitting his retirement application. Ms. Friedman, we have cases that vitiate a retirement action, i.e., hold a retirement action to be involuntary because, I believe, of intolerable working conditions or because of some sort of compulsion or misinformation or, as Judge Shaw was talking about earlier, if the agency had no basis for even alleging removal. I don't know offhand of any case in which we have held that if the putative retiree is mentally incompetent at the time of retirement that that would invalidate an otherwise voluntary, what appears to be a voluntary retirement. Do you know of any case offhand where we've ever done that? Or let me put the question a little bit differently, perhaps. You would agree that if we had an employee who was mentally incompetent and the record so supported that and the board so helped that the board would, I guess, necessarily have to hold that the retirement was involuntary because you can't do something you don't understand, wouldn't you think? Yes, and I think that goes into the cases that deal with misinformation and deceit. It's the same sort of thing that the person isn't capable of making a sound decision because of some external factor, and the external factor would be if the person is totally incompetent to make a decision. I think it would probably fall in those lines of cases. And your answer in this case is that if that was his theory, the board never knew it. That's right, and when you look at the medical evidence in the appendix, you see that he had mild to moderate depression, that he was alert, that he was able to respond,  it didn't seem to be the type of mental condition that would have prevented him from making such a decision. And the psychiatrist, by saying that he could come back to work, actually shows that he was capable enough in going about his daily activities fairly well. So it comes back down to, did he meet the three-prong test of Fruhoff? And the board's position is that he did not. The agency didn't do anything proper that precipitated his retirement. He was not faced with alternatives that he couldn't control. And the agency never urged his retirement. They did not set forth the terms of his retirement. So based on the Fruhoff case, there was no way that the board could come to the conclusion that his retirement was involuntary. Okay, thank you, Ms. Friedman. I'll just take five minutes if I may, Your Honor. Well, if you need it all. No, what I wanted to do was go back real quick and go to Dr. Darby's medical, and that's in our appendix, page 22, where the prognosis is major depression with anxiety. Axis one would be number one, major depression with anxiety. Well, there's no question that Mr. Pena had emotional stresses that he exhibited. And I'm no psychiatrist, but it seems to be he had an anger management problem, which is not uncommon. All of that is true, but I guess there are two things about that argument that trouble me. One of them is whether, given all of his problems, he still was mentally, can we say he was really mentally unable to go to the labor, I mean to the union representative and get help. He went to see the human resources person and had a long conversation, apparently, with her, with the agency. Was he so incapacitated that the action of signing his retirement could be held to be totally invalid? I'm having a little trouble getting there, but even more importantly, why didn't you bring all this to the board? Your Honor, I think we did, and it was in our submission dated June 28, 2007. We incorporated the same undisputed facts. Where's that in the joint, in either the red or the white appendix, Mr. Tierney? Your Honor, we didn't put them in there because it was our understanding that the entire record follows the case. It doesn't follow. If we need it or if there are pages that we need, you'll have to provide them. Yes, ma'am, I'll be happy to. Did you make the argument to the board that he was incompetent at the time? Well, we made the argument, Your Honor, that I was. I know the medical history. You made all the medical history in the record, but the question is what did it mean, and the answer you're now telling us is he meant he couldn't sign his name. Is that what you're saying? Not just that. To some degree, Your Honor, at that time, on that particular day, again, at the tip of the iceberg, he was not himself, but he was not himself not because he self-indulged or was taking drugs, and if you look at the record, the agency ordered a drug test even though they wouldn't call, and the supervisor did not call the emergency. They called Crime Stoppers. It's a matter of record, and that's part of the agency's file. Let me ask you this. As I understand it, the document that you submitted before the board to establish that the retirement was involuntary, is it red appendix 37 through 42? Now, we looked at that a little bit earlier, and this is where you're saying here's why the retirement was involuntary. Now, where in there is there a discussion of the mental issue that you've raised today? Namely, where in there do we see Mr. Pena arguing my retirement was involuntary because I was not mentally competent to make the decision to retire? Okay, if I may, Your Honor, the red appendix is the agency's file, right? Right, but this is your document in it. It's the government's appendix, true, but at RA 37 is the document that you submitted before the board on behalf of Mr. Pena. This is where you came in and said the retirement was involuntary, and you made a couple of arguments. You made an argument about intolerable working conditions, and you made an argument about the removal, but where in there did you say anything about Mr. Pena not being mentally competent to make the decision to retire? What we basically did was attack the so-called reason for the agency to put Mr. Pena in the position they did, Your Honor. Oh, no, I agree. No question about it. You certainly articulate that, but am I correct in saying that nowhere in that document do you say that Mr. Pena was not competent to make the decision to retire? If I'm wrong, show me where. No, I think that if we go back and take the total circumstances. No, I understand, but today you've said, and Ms. Friedman was responding, today you've said he was not mentally competent to make a decision to retire, totally divorced from what happened in January before the supervisor and the rest of them, but nowhere before the board does it appear you made that argument. My comment was precipitated by the fact that the agency had the medical evidence to show that Mr. Pena was suffering from major depression on the 15th of March, and that's at our appendix, page 22. Dr. Darby said Mr. Pena has major depression with anxiety. Then on that particular note, these are the documents that the agency wanted or demanded from Mr. Pena, and say, bring us something to show that you are not a danger to your co-workers or to yourself, which he did. Subsequent to that, four or five days later, on March the 20th, the letters dated March the 15th, he's given a letter of removal. No, I understand, but don't you agree that in your document before the board you don't argue he was incompetent? I argue that the board should have looked at the entire record. But you didn't argue, you didn't say anywhere in there, did you, that he was incompetent? I believe that we did indirectly, Your Honor. I mean, I'm not trying to sidestep you, but I'm saying that I think that the board, this court has said that the board has a duty to look at the totality of circumstances, and the totality of circumstances dictate that this particular individual, Mr. Pena, was suffering from major depression. Five days later, and I think Judge brought it up, he goes and he resigns. But the record shows that he took his wife with him. He wanted somebody there that he trusted. That's what it appears to show, because that's what the record shows, that Mrs. Pena went with him. So, as far as I'm concerned, I thought we had argued. If I didn't articulate the way I should have, I apologize, but please don't hold Mr. Pena. No, it's a tough case, Mr. Newman, because quite frankly, looking at it, I think if Mr. Pena had stayed there and challenged the removal, he might well have had a good case. But I'm having a hard time seeing a basis for saying that his decision to retire was involuntary. That's where I am. We believe that if a person suffering from major depression, and I'm by no means medically qualified to comment on it, you know, one way or the other, but I believe that if you are suffering from major depression, there are other factors that the agency should have looked at, since they demanded the information. The agency is the one that said, show us where you can work with your co-workers. Show us where you're not a danger to yourself or your co-workers. And he presents that, and instead of bringing him in and talking to him, or at least counseling him, and saying, okay, we'll give you a last chance agreement or whatever, they turn around and say, oh, by the way, now that we've looked at all your medical evidence, and yeah, you might be qualified to work with us, we're firing you. You know, we're going to try to remove you. I think that would depress anybody. If you were subject to depression, that would only aggravate, exacerbate the depression. I thought we had argued that. I apologize. We'll take it under advisement.  Thank you, Your Honors. Thank you.